UNITED STATES DISTRICT COURT                b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| DONNA CAROL WILSON | CIVIL ACTION NO. 1:15-CV-02764 |
| VERSUS | JUDGE TRIMBLE |
| CAROLYN W. COLVIN | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

I.  **Background**

   A.   **Procedural Background**

   Donna Carol Wilson ("Wilson") filed an application for disability insurance benefits ("DIB") on February 15, 2013, alleging a disability onset date of June 8, 2010[1] (Doc. 8-1, p. 114/615) due to a right arm injury, COPD, heart problems, and thyroid problems (Doc. 8-1, p. 131/615).  That application was denied (Doc. 8-1, p. 68 /615).

   A de novo hearing was held before an Administrative Law Judge ("ALJ"), at which Wilson appeared with her attorney, a witness, and a vocational expert ("VE") (Doc. 8-1, p. 29/615).  The ALJ found that Wilson last met the insured status requirements on March 31, 2011 and that, although she suffers from severe impairments of chronic obstructive pulmonary disease ("COPD") and dysfunction of a major joint, she has the residual function capacity to perform sedentary work, except that she cannot reach overhead more than occasionally with her right arm and she cannot crawl (Doc. 8-1, pp. 13-14/615).  The ALJ found there are jobs existing in

---

[1] Wilson initially alleged an onset date of January 16, 2006, but amended her onset date to June 8, 2010 (Doc. 8-1, p. 15/615)..

significant numbers that Wilson can do, such as taxi cab driver, order clerk (food and beverage), and addresser (Doc. 8-1, pp. 22-23/615).  The ALJ concluded that Wilson was not disabled as defined in the Social Security Act at any time through March 31, 2011, the date last insured (Doc. 8-1, p. 24/615).

Wilson requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 8-1, p. 5/615), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Wilson next filed this appeal for judicial review of the Commissioner's final decision.  Wilson raises the following issues for review on appeal (Doc. 10):

1. The ALJ erred in his application of Step 3 of the sequential procedure.

2. Should the ALJ have used the testimony of a medical examiner to determine if a listing is met?

3. The ALJ erred in evaluating the issue of Wilson's use of oxygen.

4. The ALJ improperly refused to obtain information relating to the testimony of the VE.

The Commissioner responded to the appeal (Doc. 11) and Wilson filed a reply (Doc. 12).

### B.   Summary of Pertinent Facts

#### 1.   Medical Records

On January 16, 2006, Wilson was in a moving vehicle accident, and underwent a humerus fracture repair (Doc. 8-1, pp. 199, 202/615).  X-rays showed probable COPD with scarring/atelectasis of her left lung base (Doc. 8-1, p. 200/615), and a comminuted displaced right humeral neck fracture with probable displaced fractures

of the lesser and greater tuberosity (Doc. 8-1, p. 206/615).  For her right four-part proximal humerus fracture, Wilson underwent an open reduction internal fixation (Doc. 8-1, pp. 235, 241/615).

In February, March, June, and July 2006, Wilson complained of right shoulder pain and decreased range of motion (Doc. 8-1, pp. 219, 224, 244-45/615).  Wilson underwent rehabilitation in February 2006 (Doc. 8-1, pp. 250-52/615).  A CT scan was ordered to locate the screw that had been placed in Wilson's shoulder joint (Doc. 8-1, p. 227/615).  In August 2006, Wilson underwent removal of the hardware in her right shoulder because she had developed pain in her shoulder secondary to symptomatic hardware as well as some arthritic change around the humeral head (Doc. 8-1, pp. 231, 467-68/615).  A metal plate and ten screws were removed (Doc. 8-1, p. 234/615).

In September 2006, x-rays showed osteopenia, a healed fracture of the humeral neck with deformity of the humeral head, and a removal of hardware (Doc. 8-1, p. 331/615).  Wilson had a limited range of motion with pain (Doc. 8-1, p. 247/615).  Wilson was given range of motion exercises, and was referred for physical therapy (Doc. 8-1, p. 247/615).  In October 2006, x-rays were unchanged from September (Doc. 8-1, pl. 330/615), and Wilson's right shoulder had a severely limited range of motion with pain (Doc. 8-1, p. 615).  Wilson was referred to physical therapy for aggressive range of motion exercises (Doc. 8-1, pp. 218, 248, 465-66/615).

In February 2007, Wilson was treated for hypothyroidism and prescribed Levothyroxim (Doc. 8-1, p. 254/615).

In March and April 2007, Wilson was evaluated by Dr. Thomas Schult, a pain management doctor, for her right shoulder pain (Doc. 8-1, p. 456-463/615).  Wilson reported constant throbbing of her right shoulder and was diagnosed with suprascapular neuralgia (Doc. 8-1, p. 458-59/615).  She underwent radiofrequency thermocoagulation of the right suprascapular nerve and injections of anesthetic and steroids to treat her right suprascapular neuralgia (Doc. 8-1, p. 228/615).  In April, Dr. Schult discontinued Wilson's Neurontin due to nausea and increased her Pamelor (Doc. 8-1, p. 457/615).

In July and September 2007, Wilson complained of constant right shoulder pain (Doc. 8-1, pp. 212, 214/615).  In November 2007, Wilson complained of worsening right shoulder pain (Doc. 8-1, p. 215/615).  Wilson reported that she had to sit on the couch for three to four hours in the morning before the pain subsides enough for her to go about her daily activities (Doc. 8-1, p. 215/615).

In September 2009, Wilson reported to the emergency room with abdominal pain and was diagnosed with alcohol gastritis (Doc. 8-1, pp. 259-60/615).  Wilson returned in November 2009, complaining of abdominal pain for three to five months, vomiting every morning, and a ten-pound weight loss in two months (Doc. 8-1, p. 261/615).  Wilson said the pain was worse after eating food (Doc. 8-1, p. 268/615), and no stones or masses were seen on a sonogram (Doc. 8-1, p. 274/615).  Wilson was diagnosed with acute gastritis and prescribed Prilosec and Cerontix (Doc. 8-1, pp. 268, 270/615).

4

In March 2010, Wilson had a disability determination examination for her right arm problems and anxiety with Dr. William Bennett[2] (Doc. 8-1, p. 286/615). Dr. Bennett noted that Wilson complained of right arm and shoulder pain daily, as well as anxiety, all since 1996 (Doc. 8-1, p. 286-615). Dr. Bennett found that Wilson could dress herself, feed herself, stand for 30 minutes at a time, walk on level ground for 100 yards, sit for 20 minutes, and could sweep, mop, cook, and wash dishes (Doc. 8-1, p. 286/615). Wilson was 48 years old, five feet and seven inches tall, weighed 145 pounds, and her blood pressure was 164/93 (Doc. 8-1, p. 287/615). Wilson had normal ranges of motion in her upper and lower extremities, including her shoulders (Doc. 8-1, p. 287/615). Wilson had mild atrophy in her right shoulder, but her strength was 5/5 bilaterally in her upper and lower extremities (Doc. 8-1, p. 287/615). Dr. Bennett concluded that Wilson did not have any significant functional limitations secondary to her right arm problems and anxiety; she had normal ranges of motion in all extremities, no evidence of joint abnormalities, and normal grip strength (Doc. 8-1, p. 287/615).

In April 2010, Cheryl Marsiglia, Ph.D., filled out a psychiatric review technique form for Wilson (Doc. 8-1, p. 292/615). Dr. Marsiglia found that Wilson has an anxiety-related disorder that is not severe (Doc. 8-1, pp. 292, 297/615). Dr. Marsiglia found Wilson has only mild restrictions of activities of daily living, social functioning, and difficulties maintaining concentration, persistence, or pace (Doc. 8-1, p. 298/615).

---

[2] Dr. Bennett's area of practice is not in the record.

In September 2010, CT scans of Wilson's abdomen showed gastroenteritis (Doc. 8-1, pp. 322-24/615).

In April 2011, Wilson went to an urgent care clinic with complaints of lower back pain and right shoulder pain (Doc. 8-1, p. 403/615).  Wilson's blood pressure was 155/100 (Doc. 8-1, p. 403/615).  Dr. William F. Yost prescribed Roxicodone, Lorcet, Klonopin, and Neurontin (Doc. 8-1, pp. 404-405/615).

In June 2011, Wilson was evaluated by Dr. Robert F. Marshall for lower back and right shoulder pain (Doc. 8-1, p. 401/615).  Dr. Marshall found Wilson had moderate pain in her right shoulder and arm, moderate tenderness over L4-5, and a decreased range of motion in her back, but no spasms or cramps (Doc. 8-1, pp. 401-02/615).  Dr. Marshall stated that Wilson "need[s] opioid therapy to tolerate the pain and be able to function with any quality of life," and continued her medications (Doc. 8-1, pp. 401-02/615).  Later in June, Dr. Marshall continued Wilson's medications, noting they met her pain relief goals (Doc. 8-1, pp. 299-400/615).

In July 2011, Dr. Marshall found Wilson's lumbar spine was mildly tender over L4-5 and had a decreased range of motion, but no spasms, and she had moderate right shoulder pain (Doc. 8-1, p. 397/615).  Dr. Marshall recommended exercises to increase Wilson's range of motion, discontinued the Oxycodone, and continued the Lorcet and Klonopin (Doc. 8-1, p. 398/615).  Wilson's visit to Dr. Marshall in August 2011 was the same as in July, and Dr. Marshall noted that Wilson was taking Cozsar, Promethazine HCL (for nausea), Lorcet, Albuterol inhaler, Albuterol inhaler HFA (for wheezing or shortness of breath), Furosemide, Flovent HFA, and Clonazepam

6

(Doc. 8-1, pp. 394-95/615). In September 2011, Wilson had moderate tenderness over L4-5 without spasms and a decreased range of motion in her back, moderate pain in her right shoulder and arm and a decreased range of motion, and her medications were continued (Doc. 8-1, pp. 392-93/615).

In mid-October 2011, Wilson was hospitalized due to her blood pressure (Doc. 8-1, p. 391/615). Wilson went to the emergency room at Huey P. Long Hospital with complaints of chest pain for two days (Doc. 8-1, pp. 334). An MRI showed a benign appearing pituitary tumor that was causing adrenal insufficiency (Doc. 8-1, p. 389/615). Wilson was diagnosed with acute adrenal insufficiency, atypical chest pain, hypertension, hypothyroidism, chronic right arm pain, and chronic obstructive pulmonary disease (Doc. 8-1, p. 334-40/615). Wilson was prescribed hydrocortisone for her adrenal insufficiency and told to take it all the time (Doc. 8-1, p. 335/615).

She saw Dr. Marshall again in late October and November 2011, and he continued her medications (Doc. 8-1, pp. 389-90/615). Wilson also complained of headaches, and Dr. Marshall instructed her to return to Huey P. Long for a follow-up on her headaches and use of hydrocortisone, which could be elevating her blood pressure (126/98) (Doc. 801, pp. 387-88/615). In December 2011, Wilson's blood pressure was 124/80, and Dr. Marshall continued her pain medications but reduced her hydrocortisone to one tablet twice a day, and instructed Wilson to contact her primary care provider (Doc. 8/1, pp. 385-86/615).

In November 2011, Dr. Jeffrey Phillips examined Wilson for an obstructive airway mass (Doc.  (Doc. 8-1, p. 451/615).  No mass was found, and Wilson was diagnosed with laryngopharyngeal reflux (Doc. 8-1, pp. 452-53/615).

In January 2012, Wilson reported continued headaches despite decreasing her hydrocortisone, and complained of shortness of breath and increased low back pain (Doc. 8-1, p. 383/615).  Dr. Marshall also found moderate tenderness at L3-4, L4-5, and L5-S1, and moderate right shoulder pain (Doc. 8-1, pp. 383/84/615).  Dr. Marshall diagnosed chronic obstructive asthma, hypothyroidism, adrenal insufficiency, shoulder pain, and low back pain, and continued Wilson's medications (Doc. 8-1, p. 383-84/615).

In February 2012, Wilson increased her hydrocortisone again, but continued to have headaches, low back pain, and right shoulder pain, and her medications were continued (Doc. 8-1, pp. 380-81/615).  In March 2012, Wilson had headaches and shortness of breath as well as moderate pain in her right shoulder and lower back (Doc. 8-1, pp. 376-77/615).  In April and May 2012, Wilson's visits to Dr. Marshall were the same, with the additions of anxiety and shortness of breath (Doc. 8-1, pp. 373-79/615).

In June 2012, Wilson had moderate tenderness and spasms over C6-7 and C7-T1, and moderate tenderness over L4/5 and L5-S1 (Doc. 8-1, p. 367/615).  Dr. Marshall diagnosed degeneration of the cervical disk, and continued Wilson's medications (Doc. 8-1, p. 368/615).  In July 2012, there was moderate pain in her right shoulder and moderate tenderness over C6-7, C7-T1, L4-5, and L5-S1, but no spasms, and Wilson

said she was having anxiety and headaches (Doc.88-1, p. 364/615).  However, in August 2012, Wilson had spasms in her neck with numbness and tingling radiating into her right arm, and moderate tenderness at L4-5 and L5-S1 (Doc. 8-1, p. 361/615). Wilson's Lorcet was discontinued and Percocet was added (Doc. 8-1, p. 362/615). Wilson's condition was the same in September 2012 (Doc. 8-1, pp. 359/60/615).  By October 2012, Wilson was no longer having muscle spasms (Doc. 8-1, pp. 357-58/615). In November and December 2012, Wilson's neck spams returned, she was having anxiety, headaches, and shortness of breath, and her medication was continued (Doc. 8-1, pp. 352-55/615).

In August 2012, a chest x-ray showed Wilson has a sclerotic and lytic lesion about the right proximal humerus (Doc. 8-1, p. 328/615).

In October 2012, Wilson was evaluated by Dr. Maan Younes, a pulmonary specialist (Doc. 8-1, p. 346/615).  Wilson reported to Dr. Younes that she has COPD, has been taking oxygen at home for two years, takes Duoneb to help her breathing, and has difficulty walking 100 yards even on oxygen (Doc. 8-1, p. 346/615).  Wilson said she had been receiving treatment for her COPD at Huey P. Long Hospital (Doc. 8-1, p. 346/615).  Wilson's pulse oximetry on room air was 98% (Doc. 8-1, p. 347/615). Dr. Younes diagnosed COPD secondary to a long history of tobacco use (30+ years, currently smoking half a pack a day), hypoxemia for which she uses oxygen at home, adrenal insufficiency, a leaky heart valve, and chronic pain in her right arm after an accident and surgeries (Doc. 8-1, p. 347/615).

In January 2013, Wilson was evaluated by Dr. Jeff Rapp, a pain management specialist (Doc. 8-1, pp. 319-20).  Dr. Rapp diagnosed chronic pain due to trauma in the right arm and shoulder and axial neck pain with cervicogenic headaches, and prescribed oxycodone (Doc. 8-1, p. 320).   In February 2013, Dr. Rapp diagnosed chronic pain due to trauma, cervical spondylosis with myelopathy, and cervicalgia, and prescribed Oxycodone, Morphine, Celexa, Fioricet, and Klonopin (Doc. 8-1, p. 314).

Wilson also saw Dr. Chris Griffin, a family practice doctor, in October 2012 (Doc. 8-1, p. 415/615).  Wilson's blood pressure was 138/104 (Doc. 8-1, p. 415/615).  Wilson returned to Dr. Griffin in March 2013 for a sudden decrease in vision, a headache, her legs were heavy, the side of her face was numb, weakness, and dizziness (Doc. 8-1, p. 413/615).  Wilson's blood pressure was 140/96 and her oxygen was 98-99% (Doc 8-1, p. 413/615).  Dr. Griffin referred Wilson to other doctors (Doc. 8-1, p. 414/615).

Wilson went to a heart specialist, Dr. A. Craig Pearce, in January 2013 for evaluation of her COPD (Doc. 8-1, pp. 407-08/615).  Dr. Pearce stated that Wilson's biggest problems are COPD and tobacco use, and diagnosed COPD, right carotid, HLP, adrenal insufficiency, and chronic pain (Doc. 8-1, pp. 408/615).

In March 2013, Wilson was admitted to the hospital with worsening symptoms of nausea, vomiting, decreased vision with headache, difficulty with coordination, and left-sided weakness (Doc. 8-1, p. 518/615).  Wilson was diagnosed with ataxis secondary to posterior cerebrovascular accident ("CVA") (confirmed with an MRI),

chronic pain, hypothyroidism, COPD, and hypertension (Doc. 8-1, p. 518/615).  Wilson was referred to rehabilitation to work on mobility and self-care skills (Doc. 8-1, p. 518-525/615).    An ECG showed there was no cardiovascular source of potential embolization (Doc. 8-1, pp. 526-27/615).   Left homonymous superior quadranopia (no vision in the left visual field of both eyes) was confirmed by an ophthalmologist (Doc. 8-1, pp. 538, 544/615).

In March 2013, Wilson was evaluated by Dr. Arsham Naalbandian, a neurologist (Doc. 8-1, p. 420/615).  Dr. Naalbandian noted a March 2013 report showed right posterior cerebral artery occlusion (Doc. 8-1, p. 410/615).  Wilson was wearing an oxygen cannula due to her severe COPD (Doc. 8-1, p. 422/615).  Dr. Naalbandian found Wilson was: (1) status post-right posterior hemispheric cerebrovascular ischemic infarct with occlusion of the posterior cerebral artery, most likely of embolic origin; (2) severe COPD; (3) history of adrenal insufficiency; and (4) history of chronic and heavy smoking (Doc. 8-1, p. 422/615).  Dr. Naalbandian recommended: (1) EEG and VER studies; (2) a Sed rate and an ANA; (3) an ophthalmology evaluation; and (4) that Wilson discontinue smoking (Doc. 8-1, p, 422/615).  Wilson's EEG and VER were normal (Doc. 8-1, pp. 423-424/615).

Wilson was evaluated by Dr. Rayland K. Beurlot in April 2013 (Doc. 8-1, p. 516/615).  Dr. Beurlot found her sensory and motor examinations were normal, she had a little more difficulty with coordination of the left upper extremity than the right, and the right upper extremity has limited flexion but is steadier than the left (Doc. 8-1, p. 516/615).   Dr. Beurlot diagnosed status post-posterior circulation

cerebrovascular accident ("CVA") with headaches, vomiting, and ataxia, chronic obstructive pulmonary disease, hypertension, and tobacco abuse (Doc. 8-1, p. 516/615).   Dr. Beurlot recommended that Wilson continue physical therapy to improve coordination and stop using tobacco (Doc. 8-1, p. 516/615).

Dr. Griffin saw Wilson again in April and December 2013 (Doc. 8-1, pp. 430-434).  Dr. Griffin noted that Wilson was still smoking and had pharyngitis (Doc. 8-1, pp. 431-34).

Dr. Naalbandian saw Wilson in June and October 2013, and January 2014 (Doc. 8-1, pp. 441-46/42/615).  Dr. Naalbandian found no recurrence of cerebroembolic disease, noted that Wilson was taking Aspirin and Plavix and was wearing an oxygen cannula, her speech was slurred, she had left hemiparesis (in the left upper extremity and a hemiparetic gait on the left side, though she was ambulatory), mild hyperreflexia on the left, and left homonymous hemianopsia (Doc. 8-1, p. 441/615). Dr. Naalbandian diagnosed status post-right posterior hemispheric CVA with ischemic infarct and occlusion of the posterior cerebral artery probably of embolic origin, and positive ANA (Doc. 78-1, p. 442/615).

In January 2013 through February 2014, Wilson continued to receive pain management from Dr. Rapp for her right arm and shoulder and axial neck pain with cervicogenic headaches (Doc. 8-1, pp. 557-615/615).   Wilson was prescribed Oxycodone, Morphine, Celexa, Fioricet, and Klonopin (Doc. 8-1, pp. 561-615/615).  By April 2013, Wilson had normal motor strength bilaterally (Doc. 8-1, p. 600/615).

## 2.    March 2014 Administrative Hearing.

Wilson was 52 years old at the time of her administrative hearing, was five feet, seven inches tall, and weighed 155 pounds (Doc. 8-1, pp. 33-34/615).  Wilson testified that she is right-handed, married, has three adult children, and lives with her husband (Doc. 8-1, pp. 34-35/615).  Wilson does not drive (since her 2006 accident), her children and husband drive her around, she has a high school education, and she used to be a licensed Pharmacy Tech (Doc. 8-1, p. 36/615).

Wilson testified that, as a pharmacy tech, she filled prescriptions, shipped prescriptions, stocked, vacuumed, and worked with the pharmacist (Doc. 8-1, p. 37/615).  The heaviest object Wilson lifted was 20 to 30 pounds (Doc. 8-1, p. 37/615).  Wilson spent most of her workday standing (Doc. 8-1, p. 38/615).  Wilson testified she had to stop working in 2006 because the car accident messed up her right shoulder and she can no longer raise her right arm above her shoulder (Doc. 8-1, p. 38/615).

Wilson has pain in her shoulder joint to above her elbow (Doc. 8-1, pp. 39/40).  Wilson testified that, in 2007, she used a TENS unit in for pain, but she did not use it in 2009-2011 because it did not help (Doc. 8-1, p. 44/615).   Wilson testified that, when conservative methods did not alleviate her pain, she was referred to pain management (Doc. 8-1, p. 40/615).  Wilson started taking Lorcet in 2010 and used a heating pad at least three times a day (Doc. 8-1, p. 45/615).  Now, Wilson takes Fentanyl in a patch, Roxicodone, and Paxil, plus Phenergan for nausea; that brings her pain level down from a 7 to a 3 (on a scale of 1 to 10) (Doc. 8-1, p. 40/615).  Wilson

testified that Roxicodone relieves her pain for about four hours (Doc. 8-1, pp. 45-46/615).

Wilson also testified that she went into the hospital for pneumonia in June 2010, was diagnosed with COPD, and was put on oxygen (Doc. 8-1, pp. 38-39/615). Wilson testified that started using oxygen 24 hours per day in June 2010, and cannot work because of that (Doc. 8-1, pp. 33-34, 46/615). Wilson testified that her husband's testimony would corroborate that she started taking oxygen 24 hours per day in June 2010 (Doc. 8-1, pp. 46-47/615).

Wilson testified that she also takes a Proventil inhaler, a Combivent inhaler, and a Flovent inhaler (Doc. 8-1, p. 416/615). Wilson testified that the medication makes her jittery and nervous (Doc. 8-1, p. 41/615). Wilson testified that she smokes if she gets "real nervous," which happens about twice a month; she smokes about five cigarettes per day for two to four days per month (Doc. 8-1, p. 41/615). Wilson testified that she stopped drinking alcohol in 2010, after she found out she has COPD (Doc. 8-1, pp. 41-42/615).

Wilson testified that she had two surgeries on her shoulder—one to repair it and one to remove the hardware in August 2006 (Doc. 8-1, p. 41/615). Wilson's shoulder pain did not get significantly better after her second surgery due to reflex sympathetic dystrophy or complex regional pain syndrome (Doc. 8-1, p. 43/615). Wilson's right (dominant) hand muscles began to atrophy in 2007, after the surgeries (Doc. 8-1, p. 43/615).

14

Wilson testified that, in 2010 and 2011, she had trouble with the function of her right hand, such as difficulty with fingering, picking up coins, and gripping and turning a doorknob or faucet handle (Doc. 8-1, pp. 43-44/615).   Wilson still has difficulty doing those things (Doc. 8-1, p. 44/615).

Wilson testified that, in 2010 (after June) and 2011, she could walk 20 to 30 feet (Doc. 8-1, p. 47/615).   Wilson had to take a rest break at least once a day for an hour or two (Doc. 8-1, p. 47/615).   On a really bad, day, Wilson would have to rest all day (Doc. 8-1, p. 48/615).   Wilson testified that, in 2010 (after June) and 2011, she had about two weeks of bad days per month (Doc. 8-1, p. 48/615).

Wilson's husband, Joseph L. Wilson, testified that they were living together in 2009 through 2011 (Doc. 8-1, p. 49/615).   Joseph Wilson testified that Wilson began using oxygen 24 hours per day in June 2010, when the doctors initially ordered her to get the oxygen machine (Doc. 8-1, pp. 49, 50/615).   Joseph Wilson testified that he remembers when she started using oxygen because he bought his truck while Wilson was in the hospital, and they bought the oxygen machine about a week later (Doc. 8-1, pp. 49-50/615).   Joseph Wilson testified that Wilson still uses the oxygen machine 24 hours per day and will use it for the rest of her life, because her condition will not improve and will get worse (Doc. 8-1, p. 50/615).   Joseph Wilson testified that Wilson had a stroke in the last year (Doc. 8-1, p. 50/615).

The VE testified that Wilson's past relevant work as a pharmacy technician was light, semi-skilled, SVP 3 (DOT 074.382-010),[3] and she occasionally had to exceed

---

[3] "DOT" is Dictionary of Occupational Titles.

the light level by lifting boxes in the 30 pound range (Doc. 8-1, p. 51/615).  Wilson does not have any transferable work skills (Doc. 8-1, pp. 51-52/615).

The ALJ posed a hypothetical involving a person with Wilson's age, education, and work experience, who is limited to lifting/carrying ten pounds occasionally and less than ten pounds frequently, sitting for up to six hours in an eight hour day, standing for up to two hours in an eight hour day, walking for up to two hours in an eight hour day, and only occasionally reaching overhead with the right upper extremity and never crawling (Doc. 8-1, p. 52/615).  The VE testified that such a person could not do Wilson's past work as a pharmaceutical technician (Doc. 8-1, p. 52/615).  The VE further testified that such a person could work as a taxicab starter (dispatcher) (sedentary, semi-skilled, SVP 3, DOT 913.367-010, 5,740 jobs in Louisiana, 184,890 jobs in the U.S.), a food and beverage order clerk (unskilled, SVP 2, DOT 209.517-014, 1220 jobs in Louisiana, 208,800 jobs in the U.S.), or as an addresser (sedentary, unskilled, SVP 2, DOT 209.587-010, 310 jobs in Louisiana, 96,560 jobs in the U.S.) (Doc. 8-1, pp. 52-53/615).

The ALJ posed a second hypothetical that was the same as the first, but had the additional limitation of no more than occasional handling and fingering with the right hand upper extremity (Doc. 8-1, p. 53/615).  The VE testified there were no jobs that such an individual could do (Doc. 8-1, p. 53/615).

C.   ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the

16

ALJ to determine whether Wilson (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Wilson has not engaged in substantial gainful activity since June 8, 2010, her disability insured status expired on March 31, 2011, and she had a severe impairments of COPD and dysfunction of a major joint, but that she did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 8-1, pp. 17-18/617).

The ALJ then found that, as of March 31, 2011, Wilson had the residual functional capacity to perform sedentary work except that she could only reach overhead with the right upper extremity on an occasional basis and she could never

crawl (Doc. 8-1, p. 18/615).  The ALJ found that Wilson was a younger individual on her date last insured (age 45-49) and has a high school education (Doc. 8-1, p. 22/615). The ALJ found that, as of March 31, 2011, there were jobs existing in significant numbers that Wilson could do, such as taxi cab dispatcher, food and beverage order clerk, and addresser (Doc. 8-1, pp. 22-23/615).  The ALJ concluded that Wilson was not disabled at any time through the date she was last insured, March 31, 2011 (Doc. 8-1, p. 24/615).  .

## II.   Law and Analysis

### A.   Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  See 42 U.S.C. 416(i), 423.  Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  See 42 U.S.C. 423(d)(2).

### B.   Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to

support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence that support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  However, the court does have authority to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## C.   Wilson does not meet Listing 1.07 and the ALJ did not err in not employing a medical expert.

First, Wilson contends the ALJ erred in his application of Step 3 of the sequential evaluation.  Specifically, Wilson argues the ALJ erred in not finding she meets or equals Listing 1.07.  Wilson also contends the ALJ have used the testimony of a medical expert to determine if a listing was met.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled.  See Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987); see also Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990).  A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1.  See Sullivan v. Zebley, 493 U.S. 521 (1990); see also Selders, 914 F. 2d at 619.  For a claimant to show that her impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  See Zebley, 110 S. Ct. at 891.

Listing 1.07 is "[f]racture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset."[4]

---

[4] Listing 1.00M states:
Under continuing surgical management, as used in 1.07 and 1.08, refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part.  It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy.  When burns are not under continuing surgical management, see 8.00F.

The ALJ considered Listing 1.07 and found "no evidence of nonunion of the facture or continuing surgical management in the last eight years.  The claimant initially had several surgeries to repair the fracture and to remove the hardware and clean up subsequent degenerative changes.  After she healed, her function was restored and she has had no further surgeries since 2006."

X-rays dated May 2006, October 2006, and January 2007 showed a healed fracture (Doc. 8-1, pp. 326, 330, 503/615)..  Since Wilson does not have a "nonunion of the fracture," she does not meet Listing 1.07.  See Aguirre-Millhouse v. Colvin, 2015 WL 3757423, *5 (N.D. Ill. 2015); Puleo v. Astrue, 2011 WL 833606, *5 (N.D. Ill. 2011).

Wilson also contends the ALJ should have employed a consultative medical expert to assist in determining whether she meets or equals a listing.  An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision.  See Anderson v. Bowen, 887 F.2d 630, 634 (5th Cir. 1989); see also Brock v. Chater, 84 F.3d 726 (5th Cir. 1996); Wren v. Sullivan, 925 F.2d 123, 127 (5th Cir. 1991); Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989).  Since Wilson clearly did not meet Listing 1.07, it was not necessary for the ALJ to employ a medical expert.

Substantial evidence supports the ALJ's/Commissioner's finding that Wilson does not meet Listing 1.07, and the ALJ did not err in not employing a medical expert.

**D.**     **The ALJ did not err in his evaluation of Wilson's use of oxygen.**

Next, Wilson contends the ALJ erred in evaluating the issue of her use of oxygen.  The ALJ did not find the testimony of Wilson and her husband to be credible.

Wilson and her husband testified that Wilson began using oxygen all day, every day in June 2010.

Wilson alleges she was hospitalized in June 2010, and that is when she was told to start using oxygen at home, all the time.  However, there is no record of a hospitalization in June 2010 and no reference to it by Wilson's other doctors.

The medical records show that Wilson had probable COPD with scarring at her left lung base in January 2006.  When Wilson was evaluated by Dr. Bennett in March 2010, she did not report that she suffered from or was being treated for COPD, or that she was using oxygen (Doc. 8-1, p. 286/615).  Wilson was hospitalized in October 2011 (for chest pain) and diagnosed with COPD at that time, as well as adrenal insufficiency due to a tumor on her pituitary gland.  However, there is no mention in the medical records dated October 2011 of Wilson using oxygen.  In November 2011, Wilson was referred to Dr. Gabriel Gomez, who did not find any obstruction in her larynx (Doc. 8-1, p. 452/615).  Again, it was not noted that Wilson was taking oxygen, and Wilson denied having dyspnea or shortness of breath. Oxygen is not mentioned until Dr. Younes noted that Wilson reported using oxygen for two years (Doc. 8-1, pp. 346-47/615).  Oxygen is included in Wilson's medication list on January 22, 2013 (Doc. 8-1, p. 407/615)

A claimant has the burden of proving she is disabled within the meaning of the Social Security Act.  That requirement means that she must show a "medically determinable" impairment and that she is unable "to engage in substantial gainful activity."  See Greenspan v. Shalala, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S.

1120 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A).

Wilson did not prove that she was using oxygen full time prior to March 31, 2011.  There are no medical records showing home oxygen was prescribed and there are no medical records or receipts showing Wilson was using home oxygen before March 31, 2011.

Therefore, substantial evidence supports the ALJ's conclusion that Wilson was not using home oxygen prior to the expiration of her disability insured status on March 31, 2011, and the ALJ did not err in failing to include it when he determined Wilson's residual functional capacity and posed hypotheticals to the VE.

### E.   The ALJ did not err in refusing to order the VE to produce evidence to support his testimony after the hearing.

Wilson contends the ALJ improperly refused to require the VE to produce evidence (data) to support his testimony after the hearing.  Specifically, Wilson wanted the VE to produce data showing the exertional and non-exertional requirements of the occupations and associated jobs listed, with the numbers of jobs available in the regional and national economies (Doc. 8-1, p. 23/615).  The ALJ refused to do so because Wilson's attorney failed to ask the VE any questions concerning the data supporting his conclusions at the hearing[5] (Doc. 8-1, p. 23/615).

---

[5] The VE specified the jobs of taxicab starter/dispatcher (sedentary, semi-skilled, SVP 3, DOT 913.367-010, 5,740 jobs in Louisiana, 184,890 jobs in the U.S.), a food and beverage order clerk (unskilled, SVP 2, DOT 209.567-014,[5] 1220 jobs in Louisiana, 208,800 jobs in the U.S.), or as an addresser (sedentary, unskilled, SVP 2, http://www.bls.gov/soc/2010/soc430000.htm - 43-5000DOT 209.587-010,[5] 310 jobs in Louisiana, 96,500 jobs in the U.S.) (Doc. 8-1, pp. 52-53/615):

Taxicab starter, DICOT 913.367-010 (motor trans.), alternate titles: cab starter; dispatcher (http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT09A.HTM):

Wilson argues that: claimants should not be required to develop legal arguments to hypothetical questions posed by the ALJ in the course of the hearing; claimants should have the right to challenge any conclusions proffered by expert witnesses; and claimants should be allowed to obtain supportive information relied on by the expert.

Social Security Ruling ("SSR") 00-4p, "The Responsibility To Ask About Conflicts," states:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

---

Dispatches taxicabs in response to telephone requests for service: Maintains operational map showing location of each cab. Contacts drivers of assigned sector by radio or telephone to relay request for service. Logs calls relayed to each driver and address of patron. Arranges for relief cab or driver. GOE: 07.04.05; Strength: S; GED: R3 M2 L2; SVP: 3; DLU: 77.

Order clerk, food and beverage (hotel & rest.), 209.567-014 (http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02A.HTM):
Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device. Suggests menu items, and substitutions for items not available, and answers questions regarding food or service. Distributes order tickets or calls out order to kitchen employees. May collect charge vouchers and cash for service and keep record of transactions. May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.). GOE: 07.04.02; Strength: S; GED: R3 M1 L2; SVP: 2; DLU: 77.

Addresser, 209.587-010 (clerical) alternate titles: addressing clerk; envelope addresser:
Addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail. GOE: 07.07.02; Strength: S; GED: R2 M1 L2; SVP: 2; DLU: 77.

Vocational testimony regarding a hypothetical claimant's ability to perform alternative available work is relevant to a "Step 5" determination, where the burden is on the *Commissioner* to show that a claimant can perform alternative available work. See Romine v. Barnhart, 454 F.Supp.2d 623, 630 (E.D. Tex. 2006). Therefore, it is the ALJ's duty, rather than the claimant's, to investigate the underlying basis for the VE's testimony.

However, it is not relevant whether the ALJ erred in denying Wilson's post-hearing request for the data in this case because Wilson has not specified how the VE's testimony was erroneous. Wilson has not pointed out any conflicts between the VE's testimony and the Dictionary of Occupational Titles. Nor has she pointed to any specific reason why she cannot do the work testified to by the VE. Thus, Wilson has not shown any prejudice stemming from denial of her request for the data underlying the VE's testimony.

Substantial evidence supports the ALJ's/Commissioner's finding that Wilson could do some work as of March 31, 2011.

III. Conclusion

For the foregoing reasons, IT IS RECOMMENDED that Wilson's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen

(14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 21st____ day of October, 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge

26